UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| DAVID A. BOWEN and WILLIAM L. HARDBARGER ) ) ) | |
| Plaintiffs, ) ) | |
| ) | Civil Case No. 1:10-CV-276 |
| v. ) ) | Chief Judge Curtis L. Collier |
| GENERAL COMMITTEE OF ) ADJUSTMENT-CSXT, WESTERN ) RAILROAD LINES ) ) | |
| Defendant. ) | |

## **M E M O R A N D U M**

Before the Court is a motion for partial summary judgment filed by Defendant General Committee of Adjustment - CSXT, Western Railroad Lines ("GCA-CSXT" or "Defendant") (Court File No. 26). Plaintiffs David A. Bowen and William L. Hardbarger ("Mr. Bowen" and "Mr. Hardbarger," collectively "Plaintiffs") responded (Court File No. 32). Defendant replied (Court File No. 33). For the following reasons, the Court will **GRANT** the motion for partial summary judgment (Court File No. 26).[1]

**I.    FACTS**

Plaintiffs, former elected officers of Defendant GCA-CSXT, bring this suit claiming: 1) they

---

[1] Plaintiffs moved to strike GCA-CSXT's reply brief, on the grounds it cites a case which Plaintiffs claim is not sufficiently related to the issues raised in the original motion and response brief (Court File No. 38). The Court will **DENY** this motion. The case cited by GCA-CSXT in its reply brief is relevant to Plaintiffs' contention GCA-CSXT was a fiduciary, even if, as Plaintiffs claim, it is distinguishable.

are entitled to payment of accrued vacation and personal leave; 2) they and their respective wives are entitled to payment of their health insurance premiums for the rest of their lives; 3) Defendant wrongfully retaliated against them in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401 *et seq.*; and 4) Defendant induced a breach of contract by Plaintiff's health insurance company. Defendant has moved for partial summary judgment, seeking: 1) a holding ERISA does not apply to Plaintiffs' claims for vacation pay and health insurance premiums; 2) dismissal of Plaintiffs' claim for health insurance premiums; and 3) dismissal of Plaintiffs' ERISA and LMRDA retaliation claims.

There is some factual disagreement in this case about what sort of entity Defendant is. According to Plaintiffs, Defendant is essentially a labor union. According to Defendant, it is not. What is uncontested is that GCA-CSXT is a *committee*, established under the Bylaws of the Brotherhood of Locomotive Engineers and Trainmen ("BLET") (*See* Court File No. 28-1 ["Bylaws"]). BLET *is* a union. It is one of many unions included in the Teamsters Division of the Rail Conference, which is a division of the International Brotherhood of Teamsters. The Bylaws of the BLET assign BLET members to local units comprised of members who work for certain railroad employers in a given geographical area. Local units in a geographical area are collected into regions. The BLET Bylaws authorize each individual region to form a General Committee of Adjustment ("GCA"). Defendant is the GCA for one particular BLET region, the "CSXT-Western Railroad Lines" region (*See* Court File No. 28, ¶ 3). BLET is not itself named as a defendant in this case. BLET is based in Cleveland, Ohio, while GCA-CSXT is based in Etowah, Tennessee (*See* Court File Nos. 32-5; 22 §I ¶ 3 ["Complaint"]).

2

Among other responsibilities, GCAs collect and distribute dues from the members of local BLET units, and represent members in disputes with railroad companies (Court File No. 28, ¶ 3 ["Moates Aff."]). GCAs are comprised of one representative from each local unit within the GCA's region. These representatives in turn elect officers, who go on leave of absence from their railroad employers and become salaried employees of the GCA. Although GCA-CSXT, along with all other GCAs, is established pursuant to the BLET Bylaws, the Bylaws themselves afford a good deal of autonomy to each regional GCA. The BLET Bylaws allow GCAs to "make such rules or regulations as are deemed necessary for the proper adjustment of differences on their respective systems," so long as these local rules do not conflict with any national BLET rules (Bylaws, p. 132). Furthermore, each GCA is allowed to determine the salaries of its own officers (*Id*., p. 135). These salaries are funded by assessments paid by all members of the BLET region served by that GCA (*Id*.). The Bylaws are silent as to whether GCAs must provide health coverage, or any other benefits, to their officers.

Plaintiffs were elected as officers of GCA-CSXT in August 2005. Specifically, Mr. Bowen was elected Senior Vice General Chairman and Mr. Hardbarger was elected Junior Vice General Chairman. Pursuant to GCA-CSXT's own bylaws, Plaintiffs were to serve in these positions until the next GCA-CSXT election in June 2009. Plaintiffs worked under the authority of Donald Moates, who was elected General Chairman of GCA-CSXT in the August 2005 election. At the time Mr. Bowen was elected he was not an active railroad company employee, but had been drawing occupational disability benefits due to a back injury since 1997 (Court File No. 27-1, pp. 26-28 ["Bowen Dep."]). Mr. Hardbarger, on the other hand, had been a railroad company employee for 25 years at the time of his election to office. Mr. Bowen, Mr. Hardbarger, Mr. Moates, and an office

3

worker were the only employees of GCA-CSXT (*See* Moates Aff. ¶ 7).[2]

Plaintiffs' time in office came to an end when they were not re-elected to office in June 2009. In this election, Mr. Bowen ran against Mr. Moates for the office of General Chairman, and lost. Mr. Hardbarger wanted to run for the office of Senior Vice General Chairman; however, because no one nominated him for the position, he was not able to run. Thus, through the loss of an election and the natural conclusion of a term in office, Mr. Bowen and Mr. Hardbarger ceased to be employed by GCA-CSXT following the June 2009 election. After their employment ceased, GCA-CSXT stopped paying the health insurance premiums for Plaintiffs and their respective wives. Plaintiffs claim they are entitled to have their health insurance premiums paid by GCA-CSXT for the rest of their lives, as well as to receive compensation for unused vacation and personal leave.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences,

---

[2]At one point, Plaintiff's brief asserts Defendant employed "a minimum of 50 employees" (Court File No. 32, p. 3). The only supporting reference given is to Defendant's "LM-2 Labor Organization Annual Report." (Court File No. 32-1, p. 2). However, this report says nothing about the number of people specifically *employed by* – that is, paid by – GCA-CSXT, it only says the number of members in the labor organization (apparently BLET's CSXT Western Railroad Lines region) is 5,204. Plaintiffs point to no other evidence to suggest anyone beyond Mr. Bowen, Mr. Hardbarger, Mr. Moates, and an office worker were actually *employed by* GCA-CSXT, let alone 5,204 people. Additionally, the Court notes GCA-CSXT's local bylaws appear to provide for a maximum of only three paid officer positions (*See* Court File No. 28-2).

4

in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III.    ANALYSIS**[3]

---

[3]At the Final Pretrial Conference on April 9, 2012, the Court expressed concern about whether GCA-CSXT is a suable entity. The Court requested briefing on this issue. Having reviewed the briefing submitted by both parties, the Court concludes GCA-CSXT is a suable entity, being a "labor organization" under the terms of 29 U.S.C. § 402(i). At the conference, Plaintiffs also asked if they could submit a recently-taken deposition along with their brief on the suability issue, and the Court agreed. However, the scope of Plaintiffs' brief (Court File No. 53) goes far beyond the suability issue and discussion of the newly-submitted deposition, to make new arguments against summary judgment, and even introduce new theories of liability. Accordingly, to the extent Plaintiffs' brief does not concern the issue of suability or the newly-submitted deposition, the Court disregards it.

5

### A. Application of ERISA

Defendant moves for summary judgment dismissing Plaintiff's claims regarding vacation time and health insurance premiums, to the extent those claims are brought under ERISA. Count I of the Complaint seeks payment of personal leave and vacation time, and the heading of that count invokes ERISA. Count II, the claim for payment of health insurance premiums, does not mention ERISA at all in the Complaint. However, Plaintiffs' response brief argues Defendant's failure to continue paying insurance premiums violates ERISA. The Court will therefore construe Count II as involving ERISA.

ERISA is a statute governing certain "employee benefit plans." *See* 29 U.S.C. § 1003. Employee benefit plans include "any plan, fund, or program which [is] established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical . . . care or benefits, . . . or vacation benefits." 29 U.S.C. § 1002(1). At the outset, it is important to be clear about the possible employee benefit plans Plaintiffs' claims concern. Count I alleges Plaintiffs were denied payment of personal leave and vacation time. Hence, to the extent any ERISA plan is implicated in this Count, it would be a plan established to provide vacation and leave benefits to Defendant's employees. Count II alleges Plaintiffs are entitled to continued payment of health insurance premiums. Hence, to the extent any ERISA plan is implicated in this Count, it would not be the actual health insurance plan itself – indeed, Plaintiffs do not claim they were denied specific medical benefits under their United Healthcare policy[4] – but a derivative plan established by Defendant to

---

[4]It is unclear whether Mr. Hardbarger was ever on this policy, or remained on the policy he was on prior to becoming a GCA-CSEX officer. For purposes of this memorandum, this is not a material issue.

6

pay the medical policy's premiums for its employees.[5]

### 1. Vacation Time[6]

Although Count I of the complaint alleges Plaintiffs are owed payment for accrued vacation time under ERISA, Plaintiffs appear to have conceded the inapplicability of ERISA to this claim.[7] Nonetheless, out of an abundance of caution, the Court will briefly address the issue. Regulations promulgated by the Department of Labor provide an employer's "payroll practices" do not constitute an employee benefit plan governed by ERISA, and specifically include payment of vacation time out of an employer's general assets as one such payroll practice. *See* 29 C.F.R. § 2510.3-1(b)(3)(i). In *Massachusetts v. Morash*, 470 U.S. 107 (1989), the Supreme Court considered whether accrued vacation pay, though not normally governed by ERISA, is "transformed" into an ERISA-governed benefit plan when it is owed to a discharged employee.[8] The Court held it is not, stating "the reasons

---

[5]It appears beyond dispute that the actual health insurance policy itself – issued by United Healthcare, administered by "Cooperating Railway Labor Organizations," and subscribed to by many unions, including BLET – is an ERISA plan (*See* Court File No. 32-3, pp. 82-86 ["Policy 107300"]).

[6]Although Count I of the Complaint refers to unpaid "personal leave" and "vacation," neither the complaint nor the parties' briefs indicate any material difference between these two terms. In the request for damages in Count I, the sum requested is described as being for "personal leave days owed." In the Introduction to Plaintiffs' brief, the benefit is simply referred to as "unpaid vacation days." The Court takes these two terms to mean essentially the same thing, and will simply speak of vacation time going forward.

[7]Defendant's brief argues at length ERISA does not apply to this claim. Plaintiffs' response brief does not counter the argument, but in a two-sentence section simply states Plaintiffs are entitled to pay for unused vacation because "it was standard practice under Moates to reimburse former officers of [GCA-CSIX] their sick leave and vacation time" (Court File No. 32, p. 7). Thus, it appears Plaintiffs' theory for Count I is contractual or quasi-contractual ("standard practice"), and not based on ERISA. Defendant admits there is a genuine issue of material fact as to whether it was "standard practice" to reimburse former officers, and does not seek summary judgment on this claim.

[8]The Supreme Judicial Court of Massachusetts had held vacation pay owed to discharged employees is akin to severance pay, and thus covered by ERISA.

7

for treating . . . payments of compensation while an employee is on vacation as 'payroll practices' are equally applicable to the payment of an employee's regular wages for accrued and unused vacation time upon discharge. . . . [T]he benefit cannot be transformed into an employee welfare benefit plan under ERISA solely because the employees did not use their vacation days prior to their formal termination." *Id*. at 119-20.

Here, it is undisputed Defendant paid vacation time out of its "general assets," rather than from a trust fund or other separate account (*See* Court File No. 27-2, p. 22 ["Hardbarger Dep."]). Accordingly, in light of the relevant regulations and the Supreme Court's decision in *Morash*, the Court concludes ERISA is inapplicable to Plaintiffs' claim for unpaid unused vacation time. This claim will nonetheless proceed to trial on the alternative grounds.

### 2. Health Insurance Premiums

Since Plaintiffs' terms as officers with GCA-CSEX ended, Defendant has not paid health insurance premiums for Plaintiffs and their respective wives. Plaintiffs claim the failure to pay premiums is a breach of fiduciary duty under ERISA, as well as a violation of GCA-CSXT and/or BLET policy. At this stage in the Court's analysis, the Court considers only the question of whether ERISA applies to Plaintiffs' claim for insurance premiums.

As briefly touched on earlier, there is an important distinction between the issues of whether the health insurance *policy* Plaintiffs' were insured under was governed by ERISA, and whether Defendant's practice of paying the *premiums* for its officers covered by that policy itself constitutes an ERISA-governed employee benefit plan. This distinction is crucial to maintain, for the crux of Plaintiffs' claim is not that they were denied a particular type of medical coverage guaranteed by United Healthcare Policy 107300, but that they were denied the benefit of GCA-CSXT continuing

8

to pay the premiums towards that policy. It is therefore beside the point whether Policy 107300 is governed by ERISA, as it plainly is (*see* Policy 107300, p. 98). The relevant question is whether ERISA governs GCA-CSEX's payment, or non-payment, of insurance premiums on its employees' and former employees' behalf.[9] The Court concludes it does not.

Plaintiffs have put forward no evidence or case law to support the proposition an employer's practice of paying health insurance premiums for its employees out of its general operating account creates an ERISA-governed employee benefit plan, or that ERISA governs an employer's decision to pay or not pay such premiums in any way. In fact, a recent Sixth Circuit case (not cited by either party) indicates ERISA does *not* apply to an employer's decision to provide or cease providing health benefits to retirees:

> [W]e assess promises to pay retirement benefits differently depending on the type of obligation involved. ERISA makes a promise to pay a covered "pension" binding

---

[9]Plaintiffs do devote a portion of their brief to arguing GCA-CSXT was a fiduciary of ERISA-governed Policy 107300, but this claim is both incorrect and inapposite to the question of whether GCA-CSXT's payment of insurance premiums for its employees is governed by ERISA. GCA-CSXT did not administer United Healthcare Policy 107300, or dictate what coverages were provided under the policy (*See* Moats Aff., ¶ 29). Nonetheless, Plaintiffs assert GCA-CSXT had discretionary authority to interpret certain terms contained in Policy 107300, such as "eligible" and "retirement," and was thus a fiduciary of the Policy, *see* 29 U.S.C. § 1002(21)(A). This assertion is based on a category mistake. While it is certain GCA-CSXT determined which employees and former employees would be "eligible" to have their premiums paid by GCA-CSXT, and how "retirement" would affect this benefit, GCA-CSXT's construal of these terms bore only on its own internal policy of paying premiums for its employees; it did not govern the meaning of the terms as used in United Healthcare Policy 107300. In other words, there is no inconsistency in imaging Plaintiffs to be "eligible" for coverage under the terms of Policy 107300, while "ineligible" under GCA-CSXT policy for having their premiums paid by GCA-CSXT. The two "policies" are not coterminous. Hence, the fact GCA-CSXT determined Plaintiffs were not eligible to have their premiums paid following their exit from office does not mean GCA-CSXT had discretionary authority with respect to terms in Policy 107300 such that it was an ERISA fiduciary of the plan. Moreover, even if it *were* a fiduciary of ERISA-governed Policy 107300, which it was not, that fact would be irrelevant to the issue of whether ERISA governs GCA-CSXT's decision to pay premiums towards Policy 107300 on its employees' behalf.

9

at retirement. 29 U.S.C. § 1053(a), but it exempts "employee welfare benefit plans" from this requirement, *see id.* § 1051(1). Thus, while ERISA heavily regulates promises to provide pension benefits, health benefits are purely a matter of contract – permitting a company to guarantee health benefits for life or to take make them changeable, or even terminable, at the will of the company.

*Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009). Accordingly, in light of *Reese*, and in the absence of any authority suggesting ERISA governs an employer's decision to pay or not pay health insurance premiums for its employees or ex-employees, the Court concludes ERISA does not apply to Plaintiffs' claim for insurance premiums.

### 3. Conclusion

In light of the Court's determination ERISA does not apply to Plaintiffs' claims for vacation time or health insurance premiums, GCA-CSXT is entitled to summary judgment on these claims to the extent they are based on ERISA.

### B. Non-ERISA-Based Claim for Health Insurance Premiums

In addition to claiming GCA-CSXT's non-payment of health insurance premiums violates ERISA, Plaintiffs also claim this action was not taken pursuant to any GCA-CSXT or BLET policy, and even if it were, such policy would violate Policy 107300. Defendant moves for summary judgment, arguing its decision not to pay insurance premiums for Plaintiffs and their respective wives is based on long-standing GCA-CSXT policy, and Plaintiffs have not raised a genuine issue of material fact as to any contractual obligation of GCA-CSXT to pay the premiums. The Court agrees with GCA-CSXT.

In its brief, GCA-CSXT claims its policy has uniformly been it does not pay health insurance premiums for ex-officers and their spouses unless the ex-officer:

1. is entitled by age (60 years or older) and years of service with a railroad employer (30 years or more) to regular retirement benefits from a railroad

10

     employer;
2.  resigns from office <u>during the term</u> of his office; and
3.  takes said regular railroad retirement upon resigning while in office

(*see* Moats Aff. ¶ 20). It is undisputed Plaintiffs did not meet these three criteria: neither was older than 60, neither had worked for a railroad employer for 30 or more years, and neither resigned from office during the term of his office to take a regular railroad retirement. Indeed, according to Mr. Moats' affidavit, which Plaintiffs do not contest, he himself did not meet these criteria when he resigned from office in 2010, and so he does not have his insurance premiums paid by GCA-CSXT (Moats Aff. ¶ 32).

  Plaintiffs' response is threefold: 1) this supposed policy (hereinafter "premium policy") did not exist; 2) this supposed policy violates the terms of Policy 107300; and 3) this supposed policy violates ERISA. As already discussed, ERISA does not apply to GCA-CSXT's practice of paying or not paying health insurance premiums for its current and former employees, thus the Court will address only the first two objection.

### 1. Existence of the Premium Policy

  Plaintiffs point out there is no written GCA-CSXT or BLET policy limiting premium payments to those officers who resign while still in office to take a regular railroad retirement to which they are entitled by virtue of age and years of service to a railroad employer. While Plaintiffs are correct there is no written policy to this effect, Plaintiffs have identified no law, or even made an argument, suggesting such a policy must be written to be effective. Of course, such an argument, were it made, would cut both ways. For just as GCA-CSXT's purported premium policy is not written, so there is no written policy *obligating* GCA-CSXT to pay health insurance premiums for all its former officers. Accordingly, the Court finds the unwritten nature of the premium policy

11

immaterial to the question of its existence.[10]

Plaintiffs also challenge the existence of the premium policy by pointing to instances where it allegedly was not followed. In his declaration, Mr. Bowen lists the names of three ex-officers he claims received insurance benefits, despite allegedly not meeting the criteria of the purported premium policy: Clarence Monin, Don Hahs, and Ed Rodzwitz (Court File No. 32-4, ¶¶ 9-11 ["Bowen Dec."]). However, beyond the declaration, Plaintiffs provide no evidence to show these individuals received insurance premiums contrary to the premium policy. Furthermore, Mr. Bowen's declaration provides no indication his contention as to these three individuals is based on personal knowledge, or that he is competent to testify on the matter (*see* Fed. R. Civ. P. 56(c)(B)(4).[11] What is more, according to GCA-CSXT, these individuals were not employed by GCA-CSXT, but by BLET. Plaintiffs offer no evidence to contradict this point. The uncontroverted testimony of Mr. Moats – who worked for GCA-CSXT for roughly 20 years – which is corroborated by a letter from BLET National President Dennis Pierce, is that the practices of the national BLET with respect to its ex-officers are not at all binding on those of the GCAs with respect to their ex-officers (*see* Moats Aff., ¶¶ 26 & 27; Court File No. 33-1).[12] This position is further corroborated

---

[10]GCA-CSXT also points out the vacation policy, which Plaintiffs seek to avail themselves of in this lawsuit, is likewise unwritten.

[11]Similarly, Mr. Bowen's bare statement in his Declaration that the payment policy did not exist is insufficient to create a genuine issue of fact as to its existence, inasmuch as Mr. Bowen provides no basis for his personal knowledge as to the non-existence of a policy he would not have even had a chance to see implemented during his one term of office.

[12]The letter by Mr. Pierce, written to a retired ex-officer of a GCA in response to issues similar to those raised in this case, states "[T]he BLET National Division plays no role in determining whether or not active and retired officers and employees of GCA's and State Legislative Boards participate in [Policy 107300]. That decision is made by each subordinate unit. . . . [I]t appears that you are confusing a GCA's authority to make [premium payments for retired ex-officers] with the National Division's authority to compel a GCA to make such payments. To be

12

by the BLET Bylaws, which are silent as to the payment of insurance premiums, and give GCAs authority to make any rules that do not conflict with the national BLET Bylaws (Bylaws, p. 132). Accordingly, even if it is true the three BLET ex-officers Mr. Bowen names received insurance premiums despite not retiring while in office to take a regular railroad retirement to which they were entitled by age and years of service, this fact would be irrelevant to the issue of whether the GCA-CSXT policy existed and was uniformly enforced with respect to GCA-CSXT ex-officers.

In sum, Plaintiffs have failed to raise a genuine issue of fact as to the non-existence GCA-CSXT's premium policy. Neither the fact that the policy was unwritten, nor the fact that BLET may have paid insurance premiums for its ex-officers more liberally than GCA-CSXT, could lead a reasonable juror to conclude GCA-CSXT's purported premium policy did not actually exist.[13]

**2. Whether the Purported Premium Policy Violates Policy 107300**

After arguing at length GCA-CSXT's purported premium policy does not exist, Plaintiffs briefly argue in the alternative that even if there were such a policy, it would be in "direct opposition to [Policy 107300]" (Court File No. 32, p. 7). This argument turns on Policy 107300's definition of "eligible employee" which requires employment or former employment by an organization subscribing to the Policy, but says nothing about having to retire while in office to take a regular railroad retirement to which one is entitled by age and years of service. However this argument, just like Plaintiffs' argument ERISA applies to GCA-CSXT's practice of paying insurance premiums,

---

clear, the latter authority is non-existent. As I have said, whether a GCA chooses to make such coverage payments for its active and/or retired officers and/or employees . . . is at each GCA's individual option."

[13]Additionally, the Court notes that non-existence of the purported premium policy would not mean the converse is true, that is, that GCA-CSXT had an affirmative policy of paying health insurance premiums for all ex-officers.

13

is based on an erroneous conflation between an individual's being "eligible" for coverage under the terms of United Healthcare Policy 107300, and being "eligible" under GCA-CSXT internal policy for having premiums paid on his behalf.

Put simply, GCA-CSXT's decision to not continue paying insurance premiums on Plaintiffs' behalf did not render them "ineligible" for coverage under Policy 107300 contrary to the Policy's terms; it simply meant Plaintiffs must pay their own premiums.[14] Payment of one's own premiums is fully consistent with being "eligible" for coverage under Policy 107300. In fact, the Policy itself, in a section titled "Important Notice to Employees," states "[e]ach Organization may require **Eligible Employees** and their **Eligible Dependents, Retired Employees** and their **Eligible Dependents** or **Eligible Dependents** of Deceased Employees to contribute toward the cost of the Health Benefits" (Policy 107300, p. 4). In other words, Policy 107300 itself recognizes different employers which subscribe to the Policy may have different premium contribution requirements for their employees.[15] Accordingly, the Court concludes GCA-CSXT's premium policy was not in tension – much less in "direct opposition" – with Policy 107300.

---

[14]Just as, for example, an employer's decision to stop paying YMCA dues for ex-employees would not render those employees "ineligible" for membership at the YMCA.

[15]This view is corroborated by the deposition of Carmen R. Parcelli, which the Court allowed Plaintiffs to submit following the Final Pretrial Conference (Court File No. 52-1, ["Parcelli Dep."]). Ms. Parcelli is an attorney for a firm which acts as outside counsel to the "Cooperating Railway Labor Organization" – an entity comprised of representatives from many unions, including the BLET – which sponsors Policy 107300. In her deposition, Ms. Parcelli repeatedly states Policy 107300 leaves it to the various subscribing employers to determine the extent to which they will pay premiums on behalf of their covered employees (*see* Parcelli Dep., p. 26 ["The plan documents reserve that decision-making about the percentage of the premium to pay as between the organization and the covered individual. They leave that to each organization individually."]; *id*. at p. 68 ["as between the organization and covered employees, each organization decides and determines how much of the premium they are paying versus how much the covered employee would be paying"]).

14

### 3. Conclusion

Plaintiffs have failed to raise a genuine question of material fact as to the non-existence of GCA-CSXT's premium policy or the premium policy's contravention of United Healthcare Policy 107300. They have likewise failed to identify any policy or contractual term which would obligate GCA-CSXT to pay health insurance premiums for Plaintiffs and their respective wives for the rest of their lives. Accordingly, GCA-CSXT is entitled to summary judgment on the claim for payment of health insurance premiums.

### C. Retaliation

Finally, GCA-CSXT moves for summary judgment on Plaintiffs' retaliation claims, brought under § 510 of ERISA, 29 U.S.C. § 1140, and the LMRDA. The claim brought pursuant to § 510 of ERISA is vaguely pleaded: Plaintiffs simply state GCA-CSXT interfered with their attempts to recover the "aforementioned benefits," and their summary judgment brief does not address the § 510 claim at all. Since the Court has already determined ERISA does not apply to the "aforementioned benefits" – namely, vacation pay and payment of insurance premiums – it is clear Plaintiffs cannot sustain a §510 claim for interfering with rights secured by an ERISA-governed plan. Accordingly, GCA-CSXT is entitled to summary judgment on this claim.

Plaintiffs' LMRDA claim is based on the statutory guarantee that all members of national or local labor organizations or committees thereof:

> shall be eligible to be a candidate and to hold office (subject to . . . reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization.

29 U.S.C. § 481(e). According to Plaintiffs, GCA-CSXT's failure to pay accrued vacation benefits and health insurance premiums was in reprisal for their running for office, and so violates the

15

LMRDA.[16]

The key problem with Plaintiffs' LMRDA claim, as GCA-CSXT points out, is there is virtually no evidence of retaliatory intent on the part of Mr. Moats or anyone else associated with GCA-CSXT. The only purported evidence of retaliatory intent Plaintiffs offer is a July 2009 letter from Mr. Moats to the national BLET President, in which Mr. Moats describes Mr. Bowen's contention he is entitled to receive health insurance premiums, and asks the national President for his "opinion and advice" on whether GCA-CSXT is obligated to pay insurance premiums for officers who do not retire while in office (Court File No. 32-5). However, no reasonable juror could distill retaliatory intent from this letter. Even viewed in the light most favorable to Plaintiffs, the letter displays no hostility at Mr. Bowen for daring to run for office, and no scheme to deny him benefits to which he is entitled. The letter simply reads as a good-faith request for an opinion as to GCA-CSXT and BLET policy during the early stages of the controversy between Mr. Bowen and GCA-CSXT. This letter, without more, does not evince retaliatory intent in GCA-CSXT's decision not to pay lifetime insurance premiums for Plaintiffs. This is especially so considering the Court's earlier determination that Plaintiffs have failed to raise a genuine question of fact as to the existence of the premium policy, or show they were in any way entitled to receive insurance premiums following their termination as officers.[17]

Furthermore, this letter, non-probative of retaliation vis-a-vis the insurance premiums as it

---

[16]The Court notes that Mr. Hardbarger did not actually run for office, since he failed to secure a nomination for the ballot. Nonetheless, the Court will credit his *desire* to run for purposes of this analysis.

[17]It being axiomatic that one is not retaliated against when denied a benefit to which he has no claim of entitlement.

16

is, does not even touch on the issue of vacation pay. Plaintiffs offer no evidence whatsoever to suggest GCA-CSXT's alleged failure to pay accrued vacation had anything to do with Plaintiffs choosing to run for office, rather than a good faith (or even non-good faith but non-retaliatory) belief that Plaintiffs are not entitled to the amount of vacation pay they seek.[18]

In the absence of any genuine question of material fact as to GCA-CSXT's retaliatory intent in not paying Plaintiffs the benefits to which they believe they are entitled, the Court concludes GCA-CSXT is entitled to summary judgment on the LMRDA claim.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** GCA-CSXT's motion for partial summary judgment (Court File No. 26). Specifically, the Court will **DISMISS** Plaintiffs' claim for vacation pay to the extent it is based on ERISA, **DISMISS** Plaintiffs' claim for health insurance premiums in its entirety, **DISMISS** Plaintiffs' ERISA retaliation claim, and **DISMISS** Plaintiffs' LMRDA retaliation claim. The following two claims will proceed to trial: Plaintiffs' claim for vacation pay to the extent it is not based on ERISA, and Plaintiffs' claim GCA-CSXT procured breach of contract.

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[18] It is undisputed GCA-CSXT did pay Plaintiffs over $10,000 each in vacation pay following their failed 2009 election bids.

17